CHARLES D. WRIGHT *vs.* FERGUS FALLS NAT. BANK *et al.*

Argued Jan. 7, 1892. Decided Jan. 18, 1892.

**Insolvency—A Judgment Suffered with Intent to Give a Preference.**
A judgment obtained by a creditor against an insolvent debtor in contemplation of insolvency, under a collusive understanding between them that the creditor shall thereby obtain a preference over other creditors, is a "security given" with intent to give a preference, within the meaning of section four (4) of the insolvent act of 1881.

Evidence *held* not to justify the findings.

Appeal by plaintiff from an order of the district court, Otter Tail county, *Baxter*, J., made August 25, 1891, refusing a new trial.

The Page Flour Mills, a corporation at Fergus Falls, Minn., being insolvent, made an assignment October 25, 1890, of all its property to Charles D. Wright, the plaintiff, under Laws 1881, ch. 148, as amended by Laws 1889, ch. 30.   Its assets inventoried at $38,409.15, and its liabilities at $97,990.69.   Among its liabilities was a debt to Fergus Falls National Bank of about $45,000, on which the bank obtained judgment by default in the district court on October 16, 1890, and issued execution thereon to the sheriff of that county, and he levied upon all the property of the Page Flour Mills, and advertised it for sale.   This action was brought to restrain the sale and set aside the judgment, and recover some payments made on the debt.   The assignee in his complaint claimed the judgment to be a security given with a view of giving a preference to the Fergus Falls National Bank upon a pre-existing debt, it having reasonable cause to believe that such debtor was insolvent.   The issues were brought to trial January 27, 1891.   The district court decided that plaintiff was not entitled to any relief whatever, and dismissed the action, being of opinion that there was no evidence that the debtor suffered the judgment to be obtained against it, with intent to prefer the bank.   Plaintiff moved for an amendment of the findings, and for a new trial, and, being denied, appealed to this court.

*John B. & Walter H. Sanborn* and *Edward P. Sanborn,* for appellant, after an elaborate examination of the evidence and statement of facts they deemed established, said:

Suffering judgment to be entered, with intent to give a preference, is cause for the appointment of a receiver.   *In re Kollmann,* 34 Minn. 282.   And such a judgment is a security given which may be avoided by the assignee as a preference.   *In re Church & Graves Mfg. Co.,* 40 Minn. 39; *Tripp* v. *Northwestern Nat. Bank,* 45 Minn. 383; *Hastings Malting Co.* v. *Heller,* 47 Minn. 71.

The insolvent knew that the natural and necessary consequence of these acts and omissions on its part would be to give the Fergus Falls National Bank a preference over its other creditors.   Every person of sane mind is presumed to intend the natural and probable consequences of his own acts, and, if such acts do in fact give a preference, the intent is inferred as a matter of law.   *Denny* v. *Dana,* 2

Cush.. 160–172; *Beals* v. *Clark*, 13 Gray, 18; *In re Black*, 1 N. B. R. 353–361; *Toof* v. *Martin*, 13 Wall. 40; *Buchanan* v. *Smith*, 16 Wall. 277.

The United States bankruptcy act of 1867, section thirty-nine, (39,) provided, among other things, that if an insolvent debtor should procure or suffer his property to be taken on legal process, with intent to give a preference to one or more of his creditors, etc., he should be deemed to have committed an act of bankruptcy, and should be adjudged a bankrupt. Rev. St. U. S. § 5128. And it was held, for a debtor to neglect to apply to be adjudged a bankrupt, and permit a judgment thereby to be rendered against him by default, and an execution issued thereon and levied, even though he had no defense, was suffering his property to be taken on legal process. *Buchanan* v. *Smith*, 16 Wall. 277; *In re Black*, 1 N. B. R. 353, 361; *In re Craft*, Id. 378; *In re Dibblee*, 2 N. B. R. 617; *Haskell* v. *Ingalls*, 5 N. B. R. 205; *In re Forsyth*, 7 N. B. R. 174; *In re Smith*, 3 N. B. R. 377.

Even fraud is thus conclusively presumed in certain cases. *Cunningham* v. *Freeborn*, 11 Wend. 241; *Waterbury* v. *Sturtevant*, 18 Wend. 353; *Fiedler* v. *Day*, 2 Sandf. 594; *Robinson* v. *Stewart*, 10 N. Y. 189; *Barney* v. *Griffin*, 2 N. Y. 365; *Collomb* v. *Caldwell*, 16 N. Y. 484.

Where the probable consequence of an act is to give a preference, the debtor will be conclusively presumed to have intended to give such preference. *In re Wells*, 3 N. B. R. 371; *Curran* v. *Munger*, 6 N. B. R. 33; *In re Drummond*, 1 N. B. R. 231.

It is not necessary that there should be an actual intent in the mind of the debtor. The intent may be inferred from circumstances. *Giddings* v. *Dodd*, 1 Dill. 115; *Martin* v. *Toof*, Id. 203; *Beattie* v. *Gardner*, 4 N. B. R. 323; *In re Kingsbury*, 3 N. B. R. 318; Bump, Bankr. 472–480, and cases cited.

The intent to prefer, within the meaning of the insolvent law, exists although the motive of the debtor in giving the preference was to obtain an extension of credit. *Corliss* v. *Jewett*, 36 Minn. 364.

Intent to give a preference follows from the fact of insolvency, and of judgment which the debtor suffers to be entered without making

an assignment, whereby all his creditors may share equally his estate.  *In re Smith,* 3 N. B. R. 377; *Driggs* v. *Moore,* Id. 602.

*Mason & Hilton* and *H. F. Woodard,* for respondents.

The object of this action is twofold: *First,* to set aside the judgment rendered against the Page Flour Mills, October 16, 1890; and, *second,* to recover moneys received by the respondent on deposit of the Page Flour Mills within twenty days prior to the time such judgment was entered.  On the 25th day of September, 1890, and for some time prior thereto, the Page Flour Mills was insolvent.  This fact of insolvency was known to respondent.  With this knowledge, the respondent on that day sued said Page Flour Mills.  The summons in the action was personally served, and the complaint, on the same day, duly filed in the clerk's office.  On the 16th day of October following judgment was entered, on default, and execution levied.  Every step contemplated or required by law to procure that judgment was taken.  The insolvent law of this state not only permits such a degree of diligence on the part of creditors, but encourages it.

We are aware that this court, *In re Church & Graves Mfg. Co.,* 40 Minn. 39, say, parenthetically, that securities given may include judgments.  Now, when the precise question is presented, if the court so hold, then such judgment, to constitute a preference, must be obtained by collusion with the insolvent, or be tainted with an intent to prefer the judgment creditor.  This intent to prefer, as we take it, means an intent on the part of the insolvent.  Every creditor seeking a judgment seeks it to secure his claim, and his intent must be to obtain a preference; but if he proceeds in the ordinary course of legal proceedings, with his complaint on file 20 days prior to the entry of judgment, and without collusion with the debtor, his judgment cannot be affected by the insolvency or assignment of his debtor.  *In re Jones,* 33 Minn. 405.  Every creditor knows, when he sues his debtor, that such debtor is, within the rule laid down in *Daniels* v. *Palmer,* 35 Minn. 347, insolvent,—knows of such debtor's inability to pay his debts in the ordinary course of business; but such knowledge has no effect upon his judgment, provided the complaint be on file, as prescribed by the insolvent act.

If these propositions are true, then the validity of respondents'

judgment, and levy thereunder, resolves itself into a question of fact, whether or not it was collusively obtained.

Counsel for appellant have devoted much time to citations from decisions under the federal bankrupt act. In our opinion, these authorities are foreign to this case, as the provisions of the bankrupt act were so different from our insolvent law. Were these provisions similar, the case of *Buchanan* v. *Smith,* 16 Wall. 277, cited by appellant, would be of force; but our insolvent law in express terms authorizes and permits the very act which the court in *Buchanan* v. *Smith* forbade. Our insolvent law is such as to render the dissenting opinion of Mr. Justice BRADLEY in that case pertinent here. Not only this, but the court in *Wilson* v. *City Bank,* 17 Wall. 473, in our opinion, and in plainest terms, adopted the views of Justice BRADLEY as expressed in said dissenting opinion. *Tenth Nat. Bank* v. *Warren,* 96 U. S. 539; *Corcoran* v. *Snow Cattle Co.,* 151 Mass. 74.

MITCHELL, J. This action was brought by the plaintiff, as assignee of the Page Flour Mills, under the fourth section of the insolvent law of 1881, (Laws 1881, ch. 148,) to set aside, as an unlawful preference, a judgment obtained by the defendant bank against the insolvent by default, and on the same ground to recover payments on the debt sued on, made by the insolvent after the commencement of the action and before judgment. Our views as to the weight and effect of the evidence are so at variance with those of the learned judges who tried the case that it becomes necessary to state the testimony somewhat at length. The insolvent was a corporation engaged in the milling business at Fergus Falls. Henry G. Page was its president and treasurer and principal financial manager. He was also president of the defendant bank, having his office in the bank building, and being evidently also the controlling spirit of its financial policy. The mill company was a customer and depositor of the bank, and also a large borrower from it, being on September 25, 1890, indebted to it in about $45,000 on overdue paper executed by Page, as president, in its behalf. Its account with the bank had also been continuously overdrawn, since the previous May, from $1,000 to $2,000, and was then overdrawn to the amount of $1,777. It was at this date (September 25th) hopelessly insolvent, as the bank offi-

cers well knew, its debts, mostly overdue, amounting to about $98,-
000, and its property, consisting principally of its mill plant, not be-
ing worth to exceed $38,000 to $40,000.   Two or three days previ-
ously Boyd, formerly the cashier, and still a stockholder, of the bank,
had come from West Duluth, for the express purpose of attending to
the claims of the bank against the mill company, and had been dur-
ing that time in frequent consultation with Page on the subject.   As
to the precise nature of these conferences and the conclusion arrived
at, Boyd and Page somewhat disagree, but what confessedly followed
leaves no room for any reasonable doubt on the subject.   On Sep-
tember 25th Page sent for Wright, the president of the First National
Bank of Fergus Falls, which was a creditor of the mill company in
the amount of $5,000, and on his arrival at the bank told him that
the mill company had been losing a great deal of money, and was in
bad shape, and that he desired to protect the local creditors, and that
Boyd would explain the details to him.   Page then called Boyd into
the room.   Boyd then said to Wright that there was some trouble;
that the mill company had got to fail, and that there had got to be
a heavy loss; that he had a plan by which they could be protected
as far as possible, but that under no circumstances would he disclose
the plan to him without his giving his pledge of secrecy that he would
not state it to any one else.   Wright having given him this pledge,
Page then (accepting as true his own version of it) told him the con-
dition of the bank so far as the mill company was concerned, and
that the plan was to obtain a judgment if they could, and make a
levy on the property, and from the proceeds of that levy and sale to
divide with him, the Citizens' National Bank, (also a creditor of the
mill company,) and their own bank, according to the amount of their
claims.   Wright testified that Boyd said that they must keep the
matter very quiet, because if it got out it would upset the whole
thing.   Boyd really does not deny this, as he admits that he said
that in conducting the suit it was unnecessary "to get out a brass
band," and inform the public that they had commenced it.   Page was
present during all this time, and at least made no objection to what
was agreed on.   Wright having assented to this arrangement, Page
then sent for Compton, the president of the Citizens' Bank, and when

he arrived the same thing was repeated that occurred with Wright, Page also being present. Compton, in behalf of his bank, also assented to the plan. It may also be stated that Compton was secretary of the mill company.

On September 24th or 25th Page took up one of the overdue notes which his bank held against the mill company, by giving the check of the mill company on the bank for the amount, which increased the overdraft of the mill company's account to $7,159.47. Immediately upon the conclusion of the arrangement between the three local banks, the defendant bank employed counsel and commenced suit against the mill company for its entire claim, including this overdraft. The complaint in the action was filed by the attorney, with an injunction to the clerk of the court to keep it out of the newspapers, which was done; all other actions commenced during the week being, as usual, given out for publication, this one alone being suppressed. The attorney himself also served the summons on Page as president of the mill company, and made affidavit of service before the cashier of the bank. Page put the summons in his pocket, and never conferred about the suit with the other officers of the mill company, or even examined the summons to see whether the amount for which payment was demanded was correct. In fact, judgment was demanded for several hundred dollars too much. A bank in St. Paul held a note against the mill company for $5,000, which matured October 9th. On October 8th, Page, in behalf of the mill company, executed and sent to that bank a renewal note payable in 30 days, but made no mention of the commencement of the suit by the defendant bank. On the 10th of October a creditor of the mill company called on Page for payment of a note against the mill company. Page and the creditor disagree somewhat as to what passed, but Page admits that he told him to call again when he was in town about the middle of October, and did not mention to him the pendency of the suit by the bank. It also appears, without contradiction, that the officers of the three banks and of the mill company kept the suit a profound secret until judgment was entered. Between September 25th and October 15th the mill company, from time to time, made various deposits to the credit of its account at the bank,

amounting in all to about $5,000, and during the same time had checked out various sums, amounting to over $1,300, so that on October 16th the overdraft of the account was much less than that on September 25th.

On October 16th, and as soon as the 20 days from the service of the summons had expired, the bank entered judgment against the mill company on default of an answer, for nearly $46,000, immediately issued execution, and levied on virtually its entire property, personal and real. On October 25th, the mill company, by Page, its president, and Compton, its secretary, executed an assignment for the benefit of creditors to Wright, who, it will be remembered, was one of the parties to the arrangement already referred to, and who was enjoined to secrecy. Page on one occasion testified, although rather evasively, that the reason he did nothing after the suit was commenced was that the mill company had no defense; but at another time he testified that he agreed with Boyd that the bank should have judgment, and that his object in keeping the matter secret was that the bank should get judgment, and thus obtain a preference over other creditors. Boyd and Evans, the cashier of the bank, testify that there was no agreement between them and Page that the suit should be kept secret in order that the bank might obtain a preference by securing judgment, but that secrecy was enjoined in order "to prevent a run on the bank." They also testified that there was nothing said about the mill company not making an assignment until after the bank obtained judgment, and on this point there is no evidence contradicting them. On this evidence the court found as facts that the action against the mill company was commenced at the instance of Boyd and Evans, without any consultation or arrangement in relation thereto with Page; that there was no agreement between the bank and the mill company that no assignment should be made by the latter until the former should obtain judgment, or that the mill company should not defend the action; but that the mill company simply permitted the action to proceed to judgment, without any action on its part. And in its memorandum the court says that it is unable to find any evidence of any intention on part of the mill company to give a preference to the bank, or that

they suffered judgment to be obtained with a view of carrying out any such intention; that there is no evidence of any positive or affirmative act from which any such intention can be inferred; that the mill company simply remained passive, and interposed no defense, because it had none; and that it was under no legal or moral obligation to make an assignment in order to prevent the bank from obtaining a preference; and therefore that the facts bring the case within the principles of law announced in *Wilson* v. *City Bank*, 17 Wall. 473.

In arriving at this conclusion it seems to us that the learned court not only misconstrued the provisions of the insolvent law, but also failed to appreciate the force and effect of this evidence. It is not controverted, and cannot be, that a judgment suffered may be a "security given," within the meaning of the fourth section of this act; and if suffered to be obtained in contemplation of insolvency, and with a view to give a preference to any creditor over another, it is void, the same as a mortgage would be, if given under like circumstances. *In re Church & Graves Mfg. Co.*, 40 Minn. 39, (41 N. W. Rep. 241.) So, under the federal bankrupt act, to *suffer* one's property to be taken on attachment, etc., with intent to give a preference, was synonymous with *procuring* it to be done. Any other construction would render the provisions of the law against preferences entirely nugatory. Of course, the mere fact that obtaining judgment *results* in a preference is not of itself enough to render it void; for, as is said in *Re Church & Graves Mfg. Co.*, *supra*, the confessing or suffering the judgment to be obtained must be tainted with the intent to give the preference to make it obnoxious to the act; or, as said in *Little* v. *Alexander*, 21 Wall. 500: "When the issue to be decided is whether a judgment against an insolvent was obtained with a view to give a preference, the *intention of the bankrupt* is the turning point in the case, and all the circumstances which go to show such intent should be considered." As we view the evidence in this case, it conclusively establishes, not only an intention on part of the insolvent, in suffering this judgment to be obtained, to give the bank a preference, but also that there was actual collusion between the bank and it to accomplish that purpose. It is unnecessary here even to con-

sider whether mere passive nonaction, strictly so called, on part of the insolvent, would be enough, for in this case the evidence is overwhelming that the mill company not only desired the preference to be secured, but promoted it by the very course of conduct best calculated to accomplish it. Keeping the matter secret, putting off other creditors until the time for entering the judgment arrived, and otherwise doing nothing, was, under the circumstances, the most effectual assistance that could possibly have been rendered to the bank in its effort to secure a preference. The excuse that the secrecy was to prevent a run on the bank has the air of extreme improbability. If that had been the object, it could have been more certainly attained by serving the complaint instead of filing it. The object in filing it was manifestly to bring the case within the proviso contained in the first section of the insolvent law. It seems to us that, if the evidence in this case does not make out a case of an unlawful preference, it would be impossible ever to make one out where it was secured by judgment, unless the parties were to deliberately sit down in advance, and enter into an express agreement to violate the law, and then publish it to the world. Conceding that *Wilson* v. *City Bank, supra,* would be in all respects an authority under our insolvent law, a comparison of the facts certified up in that case, with the evidence in this, will show how entirely dissimilar they are.

As there must be a new trial, it is unnecessary to consider the second branch of the case regarding the preferential payments. It may be said, however, that if the object of giving and receiving a check for an already overdrawn account in payment of the overdue note was to increase the overdraft sufficiently to absorb any possible deposits that the mill company might be able to make before it was closed up on execution, and thus obtain part payment of a pre-existing debt in a way that would have the appearance of being done in the regular course of business between banker and depositor, but which was in fact a device to evade the provisions of the law against preferential payments, the arrangement cannot stand. The action of the bank in continuing to pay checks drawn by the mill company as evidence that the business was being done in good faith, in the regular course of affairs, loses much of its weight in view of the fact

that it was manifestly to the interest of the bank to keep the mill company afloat until it obtained judgment. The amount which the plaintiff would be entitled to recover, if a recovery be had, would be simply the net amount which the bank actually received upon its· pre-existing debt, as shown by the state of the account on October 16th. The rule as to the application of payments upon an account. which counsel invokes, is not, in our judgment, applicable.

Order reversed.

(Opinion published 50 N. W. Rep. 1030.)